Thurman, J.
John M. Holmes purchased of John Ross a quar *404 ter section of land in Hardin county, and paid all the purchase money except $100. Being thus seized of an equitable estate, and entitled, upon payment of said sum, to a conveyance in fee of the legal title, he, on October 21,1841, conveyed the premises by mortgage deed in fee to the complainant, Teaff, to secure the payment to Teaff of $351 that day borrowed of him, and to indemnify him against loss by reason of his having become Holmes’ security upon a note of $100 to one Wilson, and to secure any future loans or-advances Teaff might make to him, and any other indebtedness he-might incur to Teaff, together with any costs or charges the latter might be put to in the collection of the moneys thus secured.. This mortgage was delivered for record October 30, 1841. On '¡’April 13, 1845, Holmes sold the premises to Jacob E. Osborn for $1,150.
On September 19, 1846, Teaff and Holmes had a settlement, when the latter, to secure the amount of his indebtedness as then found, executed to the former a judgment note under seal, at twelvemonths, for $735, with a mortgage in fee on certain real estate in-the town of Kenton.
This mortgage was not delivered for record until January 28,.-1848. In the meantime Holmes incumbered portions of said town property by other mortgages, and sold and conveyed other portions of it in fee simple. The property at the date of said second mortgage to Teaff was amply sufficient security for his claim; but by his neglect to record, the greater part of the property was swept away by the subsequent mortgages and deeds, and the security thus, became largely inadequate.
On September 21, 1848, Teaff filed his bill in Hardin common pleas, on his first mortgage, to foreclose the equity of redemption,, and have a sale of said quarter section for the satisfaction of his demands. To this bill he made Holmes, Ross, and Osborn defendants ; and after setting forth the execution and terms of the mortgage, averred that said $351, for which Holmes, at the time of executing the mortgage, had given his note under seal, remained due with interest; that he had been compelled to discharge the Wilson note, and had not been refunded; that afterward, on September 19,. 1846, upon a settlement between him and Holmes, the latter fell in his debt $735, on account of the above and other matters, for which sum said note, under seal of that date, was given, payable at twelve months, and that the same remained unpaid; that Osborn was in *405 possession of the land, claiming to have purchased it from Holmes, but that if any such purchase had been made, it was with full knowledge of complainant’s rights, and -that no notice of the purchase was given to him by Osborn, or any one for him, until after he had advanced his money and sold his goods to Holmes on the faith of said mortgage. The defendants were required to answer the bill under oath.
^Holmes answered, admitting the execution of the mort.gage, but denying that it remained in force. On the contrary, he .averred that the note for $735, with the mortgage on the Kenton property, was given and accepted in satisfaction of all complain- . ant’s claims upon him, and in discharge of the mortgage in the bill mentioned; and this was done pursuant to a proposition madeby him to complainant, after representing to complainant that he had sold the land to Osborn, and received his pay; that complainant, after .■accepting and receiving the $735 note, and the Kenton mortgage, fraudulently refused to release the first moidgage, and the securities therein mentioned.
He further answered, that he had sold to Osborn, and had received full payment; that when he sold, he told Osborn of the mortgage held by complainant, and promised to have it released as soon as he could do so.
Osborn answered, among other tnings, that he had purchased ■the land of Holmes, April 13, 1845, and paid for the same between that date and December 15,1845, and that ho has been in the exclusive possession thereof ever since May 17,1845. Denies that the mortgage in the bill mentioned, or the notes in said mortgage ■•specified, are unpaid; but, on the contrary, avers that said notes were paid by Holmes, September 19, 1846. Denies that the $735 note was executed as evidence of the balance due on said mortgage, and says it was a separate transaction, and secured by the Kenton mortgage. Avers that complainant had notice, both before and at the time of the execution of the $735 note, of his (Osborn’s) purchase of the land.
Ross, also, put in an answer, but it is unnecessary to refer to it.
To the answers of Holmes and Osborn, the complainant replied, ■and the cause went to trial in the common pleas, upon the pleadings and testimony. The court decreed a dismissal of the bill, and the complainant appealed.
In the supreme court, Osborn, by leave, filed an amended answer, *406 in which he stated that he purchased the land for *$1,150, which he paid as follows : $600 in October, 1845 ; $400 in December, 1845 ; $50 in February, 1846, and $100 to the fund commissioners of Hardin county, at a date not stated; that he had made full payment by February 1, 1848. That when he purchased, Holmes-was in good circumstances and responsible for all his liabilities, and was the owner of a large amount of unencumbered real estate; that at the several times of the making of said payments, Holmes-agreed with and assured him, that if complainant’s mortgage was a lien on the land, he, Holmes, would settle “ the same,” and that he would, as soon as he could, go to Steubenville, and have the-mortgage debt paid, and the mortgage released. Eepeats his denial that the $351 note and the Wilson claim remain unpaid, and avers that Holmes, to complete his agreement with respondent, and free him from all risk of loss, went to Steubenville to settle said mortgage and have the same released; and that, on September 19, 1846, in furtherance of said agreement and purpose, Holmes proposed to, and agreed with complainant to settle said mortgage and notes, together with all claims which the complainant held against him, and to substitute for said mortgage another mortgage on real estate in Kenton, which town property was then worth $1,500. That, pursuant to said agreement, Holmes executed, and complainant received said $735 note and Kenton mortgage. Avers that complainant then knew that respondent had purchased and paid for said quarter section, and denies that it was intended that $735 should be secured by said first mortgage. Further answering, says, that knowing said town property to be an amply sufficient security, and supposing the first mortgage to be discharged, and having paid all the consideration of his purchase from Holmes except $100 due the fund commissioners of Hardin, he and Holmes on November 5, 1846, destroyed all the original papers made at the time of the purchase, and in lieu of the title bond Holmes had executed to him, he took an assignment of the title bond Eoss had executed to Holmes. Avers that complainant, by neglecting to deliver the Kenton mortgage *for record until January 28,1848, over sixteen months-after its execution, lost nearly all the security afforded thereby, Holmes having in the meantime mortgaged and conveyed the property to other persons.
Further avers that said Kenton mortgage included nearly all the property Holmes owned out of which said debt could be secured *407 by Teaff, or by respondent, if respondent had paid Teaff’s claim and that respondent was disabled from paying the debt and indemnifying himself out of said property by the extension of twelve months given by Teaff to Holmes for payment. Avers that Holmes, about 1847, became wholly insolvent, and his property has been sold, or covered by mortgages, so that it has become impossible for either Teaff or respondent to secure said debt.
Sundry depositions having been taken and other evidence put in, the. supreme court, upon hearing the cause, rendered a decree' dismissing the bill; to reverse which decree the'present suit is prosecuted. The errors assigned are :
1. That the court erred in finding that the equity of the case was with the respondents.
2. The decree is in favor of the respondents, when it should have been in favor of the complainant.
The testimony does not, in our opinion, show that the mortgage-in the bill mentioned was satisfied and discharged by the $735 note and the Kenton mortgage; but it does show, we think, that the complainant knew, when he took said note and second mortgage, that Holmes had sold the quarter section of land to Osborn, and that Holmes’ object in giving the new note and mortgage was to protect Osborn against the first mortgage. And we think it is further proved that the complainant expressly agreed not to prosecute the first mortgage, if the property included in the second was sufficient to pay his claims. The witness, Bickerstaff, so swears ; and testifies that the agreement was reduced to writing, attested by him as a witness, and left, according to his impression, with one of the Messrs. Dillon. One of these gentlemen, Moses Dillon, testifies that he has no knowledge *of any such paper ; and though he has searched for it among his papers, can not find it. The other Dillon was not examined. As this paper was the highest evidence of the agreement, it ought to have been produced, if required, or sufficient proof made of its loss, in order to let in secondary evidence of its contents. But it was competent for the complainant to waive the objection and permit the secondary proof to be received, and we must presume that he did so, as it nowhere appears in the case that he objected to it, and its admission is not assigned for error in the bill of review. Bickerstaff’s testimony is not contradicted, but, on the contrary, is corroborated, as we think, by the circumstances of the case. It is also, in our opinion, sufficiently *408 established that the property covered by the second mortgage was much more than sufficient to secure the complainant’s claim, and that he lost that security by his own inexcusable delay for sixteen months to deliver the mortgage for record ; whereby the property was swept away by other creditors and grantees of Holmes. Holmes having become insolvent, the question is, who, under these circumstances, must be the loser, Teaff or Osborn? Thccourt below decreed that Teaff must lose. If we reverse the decree, we decide that Osborn must be the loser. For Osborn has paid for the land; and, although there is some discrepancy between his two answers on this point, yet it is well enough established that he had paid much the greater part of the consideration of his purchase before September 19, 1846 ; and that, if any part of it remained due when complainant’s original bill was filed, it was only the $100 due the fund commissioners of Hardin, and for which they held a paramount lien on the land. Now, without recurring to the general principle that the holder of two securities for the same debt is not permitted, at his pleasure, by a release of one of them, to cast the whole burden of his claim upon the other, to the prejudice of a .third person, who has obtained rights to the latter from the debtor; but, confining ourselves to the contract of the parties, and the law arising upon it, can there be a doubt how this case ought to be *decided ? It was perfectly lawful for Teaff, in consideration ■of receiving the $735 note and the Kenton Mortgage, to stipulate as he did, not to prosecute the first mortgage if the Kenton property was a sufiScient security. Such a contract was valid and might have been enforced even as between him and Holmes, if the latter had not destroyed the security by his own acts. But Teaff, when he made the contract, knew that its object was to free the land which Osborn had purchased. Could he, with this knowledge, .securely take his own time to record the Kenton mortgage? Had he a right to delay its delivery to the recorder sixteen months, and, by so doing, let the property be taken under subsequent mortgages and grants? We think not. If, instead of the mortgage, Holmes had indorsed to him, as collateral security, notes on solvent persons, and he had neglected to collect them when he might have done so, and the makers had become insolvent, it is well settled that he would be held to have made the notes his own, and that they would be treated as payment. So in this case his gross neglect has lost him an amply sufficient security for his debt; and it would be a *409 -plain violation of both legal and equitable principles to suffer him .to take advantage of his own laches to enable him to do what he had expressly contracted he would not do.
But, independently of the agreement, we should come to the same rosult. The complainant had two properties in security for his ■ claim, in one of which he knew Osborn had become interested. Could he, knowing this, release or destroy the other security, and •coerce payment of his whole demand out of Osborn’s land ? The authorities decisively answer this question.
In Cbeeseborough v. Millard, 1 Johns. 409, it was held that, “ if a ■ creditor has a lien on two different parcels of land, and anothoi* ■ creditor has a subsequent lien on one only of these two parcels, and the prior creditor elects to take his whole demand out of the parcel of land on which the subsequent creditor has his lien, the latter is ■ entitled either to have the prior creditor thrown upon the other *fund, or to have the prior lien assigned to him for his bene.fit. So, if a creditor by bond exacts the whole of his demand from one of the sureties, that surety is entitled to be substituted in his place, and to a cession of his rights and securities, as if he were a purchaser, either against the principal debtor or his co-sureties. And if the prior creditor has put it out of his power to make the ■cession, it seems that he will be excluded from so much of his de.mand as the surety or subsequent creditor might have obtained if the cession could have been made.”
These principles cover the whole case before us ; for it will not -be denied that a subsequent purchaser of the fee, absolutely, stands .in as good a condition as a subsequent mortgagee. They are both purchasers, and their equities, as against the paramount incumbrance, are equal. Nor can it be gainsaid that where the creditor who has the securities suffers one of them by his laches to become valueless, he is in no better position than if he had released that security. Here, then, if the Kenton mortgage were valuable, Osborn would, upon the principle of the case just cited, have a right to require Teaff to resort to it first, or at least to assign it to him, Osborn. But it has become worthless owing to' Teaff’s failure to re■cord; and he has, therefore, no right to offer a cession of it to ■Osborn; and, as it was more than sufficient to satisfy the debt, there is no longer any right to resort to Osborn’s land for payment.
Stevens v. Cooper, 1 Johns. 425, was a case in which' a mortgage -of six lots was given to secure a debt. The mortgagor subsequently *410 sold the lots, separately, to different persons. After this the mortgagee released four of the lots from the lien of the mortgage. The: question that arose was, whether, under these circumstances, he could have payment of his whole demand out of the remaining two lots. It was decided that he could not; that these lots could only be charged with a rateable proportion of the debt. Had the release of the four lots taken place while they yet remained the property of the mortgagor, but after the sale of *the two lots, and had the four lots at the time of the release been amply sufficient to pay the debt, then, if the release was given with knowledge that the two lots had been sold and paid for, there can be no doubt but that the chancellor would have held the two lots to be wholly freed from the mortgage. The principle upon which his decision, went would have required him so to hold.
So, in Johnson v. Rice, 8 Greenl. 157, it was decided that if the-mortgagor alien the land in severalty to divers purchasers, and the-mortgagee, knowing this, release to one of them, without the assent, of the others, his lien is, pro tanto, extinguished.
So, if Teaff had recorded the second mortgage in time to make-it a paramount lien on the Kenton property, and had afterward released to the subsequent purchasers from Holmes, it might be, independently of his agreement, that he could resort to Osborn’s-land for a rateable proportion of his claim ; but, by his failure to-record and obtain the paramount lien, when he might have done so, he has lost this right. For had he thus obtained the paramount lien, he would have had an ample security, to which Osborn could have compelled him first to have recourse; but by his own inexcusable fault, he has deprived Osborn of this right; and he ought, ' therefore, to sustain the loss, rather than that Osborn should be: prejudiced by his neglect.
These views render it unnecessary to consider what effect, if any,, the extension to Holmes, of time for payment, had upon the rights-of the parties.
¥e are satisfied that the decree of the supreme court was entirely correct; and the bill of review must, therefore, be dismissed.

Bill dismissed.